ELDER *et al.* v. HORSESHOE MINING AND MILLING CO. *et al.*

1. Rev. St. U. S. § 2324, provides that not less than $100 annually shall be put upon a mining claim, and that, on failure of a co-owner to contribute his share, those who have made the improvements may a the end of the year give the delinquent personal notice in writing, or notice by publication, and if, after ninety days, he fails to contribute, his interest in the claim shall become the property of said co-owners. *Held,* that where a delinquent owner was dead, and there was no administrator, a published notice addressed to the delinquent "his heirs, administrators and to all whom it may concern," was effectual to cut off the interests of the heirs, whether minors or not, on their failure to contribute within the time specified, and vest title in the other owner.

2. Under said statute it is optional with the co-owner who makes the improvements, to serve personal notice or publish the same.

3. The fact that the heirs were not individually named was immaterial.

4. Where a co-owner has failed to contribute his share of the expenditures for several years, the delinquencies for said years may be grouped in one notice.

(Opinion filed May 6, 1897.)

Appeal from circuit court, Lawrence county.   Hon A. J. PLOWMAN, Judge.

Plaintiffs had judgment, and defendants appeal.   Reversed. The facts are stated in the opinion.

*Edwin Van Cise*, for appellants.

*Martin & Mason* and *Frank McLaughlin*, for respondents.

CORSON, P. J.   In January, 1878, Charles H. Havens and Rufus Wilsey located a mining claim in the Black Hills under the name of the "Golden Sand Lode."   In June, 1878, Wilsey died, leaving a widow and several children, who then, and have ever since, resided in the state of Iowa.   After the death of Wilsey, Havens continued to make the required annual expenditure upon the claim until 1892, when he sold the same to Thomas H. White, the managing agent of the defendant.   At the time of his sale, Havens assumed to be the owner of the whole claim, by virtue of proceedings taken under the provisions of Sec. 2324, Rev. St. U. S., by which he sought to transfer the interest of Wilsey to himself.   The validity of these proceedings constitutes the principle question in this case.   To fully comprehend the various questions arising out of these proceedings, it may be proper to state that, soon after the death of Wilsey, one John Stephens was appointed administrator of his estate by the probate court of Lawrence county.   This administrator died in 1888, and there was no administrator of the estate of Wilsey after that time until 1893, when the plaintiff Elder was appointed.   After Thomas H. White purchased the Golden Sand claim from Havens, he, through Joseph M. Thomas, a nephew, caused the said Golden Sand claim to be relocated un-

der the name of the "North Lode," and an application for a United States patent to be made therefore, which was issued to said Thomas, who in November, 1893, conveyed the patented claim to the defendant and appellant.    The undisputed evidence shows that the expenses for work done upon the North claim after its location, and the expense of obtaining a patent therefor, were paid by the defendant the Horseshoe Mining Company. In the summer of 1893, after the plaintiff Elder was appointed administrator of the estate of Wilsey, he, together with the heirs of the estate, tendered to said White, Thomas, and the defendant, one-half of the amount of the annual expenditure required to be made upon the Golden Sand claim from 1878 to 1893, and demanded a deed for one-half of the claim as patented by said Thomas, as the "North Lode." The parties refusing to make such conveyance, this action was instituted, in the name of the administrator and heirs, to recover one-half of the property.    The case was tried by the court without a jury, and it found in favor of the plaintiffs, and the defendants have appealed.

It will be noticed that from 1888 to 1893 there was no administrator of the estate of Wilsey. The record discloses no transfer of the Golden Sand location by Thomas H. White to the defendant, and its title rests entirely upon the North lode location. It will be observed that the Golden Sand lode was located in 1878 by Havens and Wilsey; that Wilsey died during the same year; that Havens did all the annual work required upon the claim from 1878 to 1892, and that in the latter year he transferred the whole claim to the agent of defendant; the Golden Sand lode was then relocated by the agent of the defendant as the North lode, and a patent issued therefor; and that the same was conveyed to the defendant the Horseshoe Mining Company. It is claimed by the plaintiffs that the relocation was a fraud upon them. But, in the view we take of the case, the only material question to be considered is as to the validity of Haven's proceedings in his attempt to acquire the

half interest of Wilsey to the Golden Sand lode; for, if he ac-
quired a valid title to the Wilsey interest, then it was immater-
ial as to what disposition the defendant made of the claim sub-
sequent to the transfer of the same by Havens, as it is not dis-
puted that Havens' conveyance was, in form a conveyance of
the whole claim. For the purposes of this case, we shall as-
sume, as found by the court, that the Golden Sand lode was
properly located, and was a good and valid location at the time
of the death·of Wilsey, and that the annual assessment work
was duly performed upon said claim up to the time it was trans-
ferred by Havens to White, in 1892. If, therefore, the pro-
ceedings taken by Havens devested the estate of Wilsey of its
title, then the defendant obtained a good title to the whole
claim under the North lode location.

In order to establish the fact that Havens had complied
with the provisions of the United State statute, and had there-
by acquired the Wilsey interest, defendant offered in evidence
two published notices, published at the same time, and being
substantially copies of each other, except that the first covered
a period of eight years and the latter one year. The notice is
as follows: "Notice of Forfeiture. To Rufus Wilsey, his heirs,
administrators, and to all whom it may concern: You are
hereby notified that I have expended $800 in labor and improve-
ments upon the Golden Sand lode, * * * as will appear by
certificate filed on Jan. 2nd, 1889, in the office of the register of
deeds of said Lawrence county, in order to hold said premises
under the provisions of the laws of the United States and of
this territory; that being $100 per year, the amount required to
hold the claim for the years ending December 31st, 1880, De-
cember 31st, 1881, December 31st, 1882, December 31st, 1883,
December 31st, 1884, December 31st, 1885, December 31st, 1886,
and December 31st, 1887. And if, within ninety days after this
notice by publication, you fail or refuse to contribute your pro-
portion ($400, being $50 for each of said years), your interests
in said claim will become the property of the subscriber, under

Sec. 2324, Revised Statutes of the United States." To the introduction of this notice the counsel for the plaintiffs interposed the following objections, among others: "(5) Because the notice is itself a nullity, because it is shown in the record that Rufus Wilsey was at the time deceased, and a notice cannot run of forfeiture against a dead man or his estate. Neither is this notice addressed to the administrator of the estate, in name or by the proper designation, nor are the heirs enumerated in the notice; and a notice to the persons by description is in all cases invalid. The further objection is made to this notice of forfeiture that no sufficient pleading upon the subject is set out in the answer. Further objection is made to this one now offered, that the notice is further invalid because it undertakes to group the notice of the forfeiture for several years in one notice; also the further objection that no sufficient foundation for the publication of the notice, instead of the personal service of it, has been laid; and further, that it is not shown that, if the publication were proper, the Lead Herald, the paper referred to, was the paper required by the statute in which it could be published." The court sustained the objection, stating that "the objection will be sustained on the ground that the evidence in this case shows that Rufus Wilsey was dead, and that there was no legal administrator; his administrator was also deceased at the time this notice of forfeiture was published; and that, therefore, his co-owner gained nothing by it." The second notice offered was for the year ending December 31, 1888, and the amount specified was $50. The same objection was taken and the same ruling made by the court.

Congress in 1872 enacted the present mining law, and therein provided that all valuable mineral deposits should be "free and open to exploration and purchase, and the lands in which they are found to occupation and purchase." The act prescribes the size of claims, manner of locating same, and that not less than $100 "worth of labor shall be performed or improvements made during each year." The act also provides

that "the locators, * * * their heirs and assigns, * * * so long as they comply with the laws of the United States and with state, territorial and local regulations * * * shall have the excluside right of possession and enjoyment" of the claim located. Sec. 2324, after prescribing the value of the work to be done or improvements made during each year, further provides that: "Upon a failure to comply with the foregoing conditions of annual expenditure, the claim or mine upon which such failure occurred shall be open to relocation in the same manner as if no location of the same had never been made; provided, that the original locators, their heirs, assigns or legal representatives have not resumed work upon the claim after failure and before such relocation. Upon the failure of any one of several co-owners to contribute his portion of the expenditures required thereby, the co-owners who have performed the labor or made the improvements may, at the expiration of the year, give such delinquent co-owners personal notice in writing or notice by publication in the newspaper published nearest the claim, for at least once a week for ninety days, and if at the expiration of ninety days after such notice in writing or by publication such delinquent shall fail or refuse to contribute his proportion of the expenditure required by this section, his interest in the claim shall become the property of his co-owners who have made the required expenditures." It will thus be seen that the estate of the locator or owner of a mining claim, before a patent is issued, is a conditional estate, subject to be defeated by a failure to perform the required annual work upon the claim, and that any qualified person may take advantage of the failure to perform the condition and relocate the same. It follows, therefore, that the locator, his heirs or assigns, must see that the condition is performed, in order that their right to the possession may continue. When the location is made by two or more, they become co-owners, and one or more of the co-owners may do the required work upon the claim, and thus perform the condition, and thereby continue the right of them-

selves and co-owners to the exclusive possession of the claim. But no duty is imposed upon any one co-owner to do this. If the work is done, however, by one or more, the law requires the other co-owner or co-owners to contribute his or their share of the required expense; and upon failure so to do, his or their interest becomes the property of those performing the work, upon compliance with the requirement of the statute, which is the giving "such delinquent co-owner personal notice in writing or notice by publication in the newspaper published nearest to the claim." The statute makes no specific provision for any address or heading to the notice. As will have been observed, the notice in the case at bar is addressed "to Rufus Wilsey, his heirs, administrators, and to all whom it may concern." Wilsey having died in 1878, the notice, as to him, was nugatory. It was also addressed to the administrators. There being none then living, it could have no effect in that respect. But it is also addressed to the "heirs, and to all whom it may concern." At the time this notice was published the title to a one-half interest in the claim was in the heirs, subject to the lien of the administrator for administration purposes, and had been since the death of Wilsey. Comp. Laws, §§ 3400, 5772, 5860, 5862; *In re* Woodworth's Estate, 31 Cal. 595; Meeks v. Hahn, 20 Cal. 627; Brenham v. Story, 39 Cal. 179; Janes v. Throckmorton, 57 Cal. 368; Beckett v. Selover, 7 Cal. 238. It is said in the latter case "that both the real and personal estate of the intestate vests in the heir subject to the lien of the administrator for the payment of debts and the expenses of administration and with the right of the administrator to present possession"; and this, says Mr. Justice FIELD in Meeks v. Hahn, *supra*, "is the true rule." The provisions of our own statute upon the subject of succession, and the provisions of our Probate Code bearing upon this subject, are substantially, if not identically, the same as the corresponding sections in the California Code. If this view of the law is correct, the heirs of Wilsey were in fact co-owners with Havens in the Golden Sand claim from 1878

to the time of the publication of the notice; and the notice directed to them as heirs would seem to be sufficient to charge them with notice, and require them to pay the estate's proportion of the expenses. If such was the position of the heirs, the existence or non existence of an administrator could not affect them. Having succeeded to the Wilsey interest, they took it burdened with the condition that their share of the annual expenditure must be provided for. It was their duty, therefore, to see that the work was done. The heirs are presumed to know the law, and to know that this work was required to be done annually. The fact, therefore, that there was no administrator when the notice was published, seems not to be very material.

But, in the view we take of the provisions of the United States statutes from which we have quoted, the question of the rights of heirs and of administrators over the real property of a deceased becomes unimportant. We are clearly of the opinion that congress, by the provision we are considering, intended that the notice published should have the effect of notice to all parties who might have any interest under the co-owner who is in default, and cut off all such interests, whether the parties claiming are minors, heirs, or lien holders, when, as in this case, the notice is so addressed as to include all parties. It is apparent that congress, by the notice, intended to give to one or more co-owners who may cause the required work to be done upon the claim a summary remedy for collecting from a co-owner his proportionate share of the expense so necessarily incurred to protect the claim, either in money, or by taking the co-owner's interest in the claim. The evident purpose and object of the law of 1872 were to encourage the exploration and development of the mineral lands of the United States, and the sale of the same, and all the provisions of the law seem to have been framed with that object in view. This is apparent from that part of the act providing that, unless the annual expenditure shall be made each year, the claim shall be subject to re-

location; and no rights of heirs, minors, widows, or lien holders are excepted or reserved, and no proceeding, judicial or otherwise, is required to devest the delinquent locator or locators of his or their interest, or the interest of heirs or lien holders in the claim. If the required work is not performed, and the claim is relocated after the expiration of the year, the rights of all the parties are absolutely cut off, though the failure to do the work may have been caused by the death of the locator or locators during the year. Again, when an application for patent is made, the land officers are required to publish a notice —not addressed to any one—that such application has been made. If no adverse claim is filed within 60 day after the first publication of such notice, the rights of all parties holding adverse claims are cut off, without regard to whether the parties claiming them are minors, heirs, lien holders, or otherwise. These illustrations sufficiently disclose the intention of congress in the passage of the act of 1872. We feel justified in the conclusion that congress, in adopting the provisions in regard to the disposition to be made of a defaulting co-owner's interest in the claim, acted upon the same theory, and the published notice was intended to accomplish the same result as the published notice of application for a patent; that is, to cut off the claims of all persons, and vest in the co-owner a clear title to his co-owner's interest, without regard to the interest of minors, lien holders, or incumbrancers. This, as I understand, is the view taken by the United States land department of this provision. That department requires abstracts of title, and, when it appears by the record that the proper affidavits have been filed and the proper notice published, no further evidence is required. But if the construction contended for by the learned counsel for the respondent is correct, then the department should require proof that the co-owner was living at the time the notice was published, or, if dead, that there was an administrator appointed, and then performing the duties of his office, and that the heirs were not minors, and possibly a num-

ber of other facts, in order that the applicant's title should be regarded as sufficient to entitle him to his patent.    With such a construction as is contended for, the provision would be absolutely worthless, and, instead of conferring a benefit upon the co-owner, would be a delusion and a snare.    No person could safely invest in a claim in the chain of title to which there was such a notice, however regular it might appear to be by the record.    It will be further observed on reading the provision that the conditions under which the notice may be served personally are not prescribed, thus leaving it optional to the party when and under what circumstances he will serve the notice personally; clearly indicating that, in the opinion of congress, the notice would ordinarily be published, and, as we reason, in order that the liens of all parties might be cut off, and that the true owner be vested with a clear title.    This construction of the law renders the notice, when rightfully published, effective in cutting off the claims of all parties, and thus keeping the title clear and free from uncertainty and doubt. It gives to the notice the effect usually designed to be given to that class of notices when the claims of all persons are intended to be cut off, as in the case of mortgages containing a power of sale (Reilly v. Phillips, 4 S. D. 604, 57 N. W. 780), probate court proceedings, applications for patents, etc.    The court was in error in excluding the notice, and for this error the judgment of the court below must be reversed.

The other objections made to the admission of the published notice, it seems to us, do not merit very much consideration. The objection that the heirs are not individually named in the notice cannot be sustained.    To require of a co-owner to ascertain, at his peril, the names of all the heirs of delinquent co-owners, would be to impose upon him a burden the law never intended should be imposed, and one that could be of no possible benefit to any one, as the heirs, if personally named, would be no more likely to obtain actual notice than when named simply as heirs.    Neither do we think there is any merit in the objec-

tion that in the one notice the expenditure for eight years is included.    Certainly, if the parties interested intended to pay, and thus protect their interest in the claim, they would be greatly benefited by grouping them all in one notice.    If they did not intend to pay, the grouping would be immaterial to them.    The law does not prohibit it, and we can discover no valid reason why it may not be done.    The objection that the notice was fatally defective because addressed to Rufus Wilsey and administrators, as well as heirs, and to all whom it might concern, is not tenable.    It was one method of designating by whom the claim was located.    Perhaps the notice addressed to the heirs of Rufus Wilsey, deceased, would have been more technically correct; but we think the form is not material, so long as the statute is substantially complied with.    The insertion of the administrator could do no harm, even if there was none.

There are numerous other errors assigned in the record, but we do not deem it necessary to discuss them at this time. The judgment of the circuit court, and the order denying a new trial, are reversed.